**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

SBA Towers II, LLC

      v.                                        Civil No. 07-cv-209-JM

Town of Atkinson,
New Hampshire

**O R D E R**

Before the court are cross motions for summary judgment
(document nos. 18 & 24) filed in this action brought pursuant to
the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B)
("TCA").  Plaintiff SBA Towers II, LLC ("SBA") seeks review of a
decision by the Zoning Board of Adjustment ("ZBA") of the Town of
Atkinson, New Hampshire ("Town"), to deny plaintiff's application
for a special variance to install three flush-mounted wireless
telecommunications antennas on an existing tower located in the
Town.  Plaintiff contends the denial is not supported by
substantial evidence, in violation of 47 U.S.C. § 332(c)(7)(B)
(iii) (Count I), and effectively prohibits plaintiff from
providing personal wireless services ("PWS") to its customers, in
violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) (Count II).  The
parties move for summary disposition of only the substantial

evidence claim, pursuant to a case schedule agreed to by the
parties and approved by the court, which suspended discovery on
the effective prohibition claim until the substantial evidence
claim was resolved.  For the reasons set forth below, plaintiff's
motion for summary judgment that the denial was not supported by
substantial evidence (document no. 18) is granted, and
defendant's motion (document no. 24) is denied.

Discussion

**1.  Background**

For more than a half century, the property at issue, located
on Hog Hill off of High Hill Road, in Atkinson, New Hampshire,
has been used to transmit communication signals.  See Certified
Record of the ZBA[1], Ex. 1 (application for Special Exception) &
Ex. 7 (minutes of 1/10/07 ZBA hearing).  In the 1950's a radio
tower was built on the property.  See id. at 4.  In the 1980's,
the then-current owners of the property and plaintiff's

---

[1]The complete record of the ZBA proceedings has been filed,
in four sections, as documents no. 13, 14, 15 and 16.  Those
"documents" simply attach the exhibits from the ZBA proceedings,
as follows:  document no. 13 attaches exhibits 1-15, document no.
14 attaches exhibits 16-25, document no. 15 attaches exhibits
26(a)-(h), and document no. 16 attaches exhibits 27-38.  The
exhibits shall be cited as "CR Ex. #," with the appropriate
exhibit number cited, and with no additional reference to
document no. 13, 14, 15 or 16.

predecessor-in-interest, Pauline and Kenneth Hoyt, began
construction of a new tower without first obtaining the requisite
Town permits.  <u>See</u> <u>id.</u>  The Town filed an action against the
Hoyts, which was settled by the parties entering into a
Stipulation on January 22, 1985 that authorized the Hoyts to
construct a 175-foot needle tower on the property.  <u>See</u> CR Ex. 5,
<u>Atkinson v. Hoyt</u>, No. E-172-82, Stipulation (Rockingham County
Sup. Ct, Jan. 22, 1985) ("Stipulation").  Because the property is
located in a "rural residential-2" ("RR2") section of the Town,
which is zoned for "agricultural, forestry, and low density
residential uses," <u>see</u> Pl.'s Mot. for Summ. J., ("Pl.'s Mot."),
Ex. A (attaching "Article V: Zoning District Regulations, Section
500, Zoning District Objectives and Guidelines, § 500:3 (RR-2)"
of the Town ordinance), the stipulated needle tower is a non-
conforming use of the property.

     The Stipulation provided for the Hoyts to remove the "new"
tower and the original radio tower, and to construct a needle
tower, as specified in the Stipulation.  The tower was to carry
"no more than three (3) dish-type devices not to exceed thirty
(30) inches in diameter," which would not interfere with
electrical appliances in neighboring homes.  <u>See</u> <u>id.</u> at 3.  The

3

resulting 160-tall, galvanized steel guyed tower, referred to

locally as the "Eiffel Tower," was used for two-way communication

by commercial businesses.  The Stipulation required regular

inspections of the tower to ensure its structural integrity.  It

also provided that the agreed-upon conditions were binding on the

Hoyts, "their assigns, successors, and heirs, and shall be

covenants which run with the land."  Id. at 1.

In 2002, a subsequent owner of the property, Signal Towers,

Inc., sought to expand the use of the tower by adding antennas.

The Town filed an action against Signal to prevent it from

progressing with its proposed changes, which the Town perceived

as not being consistent with the 1985 Stipulation.  The parties

settled this dispute by executing an Addendum to the Stipulation

in 2005.  See CR Ex. 6, Atkinson v. Signal Tower, Inc., No. 04-E-

140, Addendum to Stipulation (Rockingham County Superior Court,

October 15, 2005) ("Addendum").  The Addendum allowed Signal to

maintain eight antennas on the tower:  one dish antenna for

paging receiving, two whip antennas for paging transmitting, one

grid antenna for wireless internet receiving, one whip antenna

for wireless internet transmitting, one whip antenna for two-way

radio receiving, one whip antenna for two-way radio transmitting,

and one whip antenna for backup.  <u>See</u> CR Ex. 6 at ¶ 6.  The
Addendum provided for further amendment, as agreed upon by the
Town and the current owner of the tower, and approved by the
Rockingham County Superior Court.  <u>See</u> <u>id.</u> at ¶¶ 7-9.

Following the October 2005 settlement, Signal sold the
property to Mariner Tower, LP ("Mariner"), which leased the
antenna facilities to wireless service providers as "cell sites,"
to provide signal coverage in the geographic area.  One of its
customers is T-Mobile (Omnipoint Communications, Inc.) ("T-
Mobile"), which wanted to fill a gap in its personal wireless
service network by installing three additional T-Mobile antennas
on the tower.  Mariner proposed replacing three of the tower's
whip antennas with three flush-mounted panel antennas from T-
Mobile.

On October 19, 2006, Mariner sought approval of the proposed
change from the Town's Board of Selectmen ("Selectmen"), pursuant
to the terms of the Addendum and Stipulation.  <u>See</u> <u>id.</u> ¶ 8.
Because the tower is a nonconforming use of the property, the
proposed change raised the issue of whether or not a special
exception from the ZBA was required.  <u>See</u> CR Ex. 4.  The Town
zoning ordinance, at Article 7, Section 700:1(a) states:

> No extension, expansion, enlargement or
> alteration of a nonconforming use will be
> allowed without the granting of a Special
> Exception by the Board of Adjustment.  This
> Special Exception shall be issued in the
> form of a special permit which shall expire
> within one (1) year unless acted upon by the
> permittee.

Concerned that the proposed change might be an expansion or
alteration of the current use of the tower, the Selectmen
directed Mariner to the ZBA to determine whether a special
exception was required.  See Pl.'s Mot., Ex. C (minutes from
12/4/06 Board of Selectmen hearing).  The Selectmen specifically
chose to withhold consideration of Mariner's proposal until after
the ZBA made its decision, see id., because the Addendum required
that "any and all proposed changes to the use of the needle tower
. . . be . . . abiding by and in accordance with all applicable
Federal, State, and Local laws and ordinances."  CR Ex. 6, ¶ 9.

On December 22, 2006, Mariner applied to the ZBA for a
special exception.  Although Mariner postulated that a special
exception was not required to make the minor changes to the tower
that Mariner proposed, it filed the application pursuant to the
Selectmen's request.  See CR Ex. 1.[2]  In its application, Mariner

_____

[2]Although Mariner refers to the tower as being located on
Hog Hill Road in its application, see CR Ex. 1, the road is also
referred to as High Hill Road in the record.  See id., Tab 5 and

represented that the proposed "minor modifications" to the tower would "promote safety, convenience, general welfare, efficiency, economy and safety from fire, panic and other dangers by providing improved wireless services to the Town of Atkinson and the Route 121 corridor." <u>Id.</u>  Mariner requested permission:

> (A)  to remove several antennas provided for in the Addendum and replace them with new antennas, specifically:
> (i)  to remove
>     – one eight foot long antenna from the 160-68' position,
>     – one twenty foot long antenna from the 129-40' position, and
>     – one grid antenna from the 97-99' position,
>     – and the associated brackets and coaxial cables; and
> (ii) to install in their place
>     – three six foot long antennas grouped at the 142-48' position with flush mounted brackets and coaxial cables,
>     – and one seven inch long antenna and cable at the 50' position.
>
> (B)  to relocate one three foot dish antenna from the 20-23' position to the roof of the existing equipment shelter,
>
> (C)  to place three new radio equipment cabinets within the existing equipment shelter, and
>
> (D)  to allow T-Mobile to colocate on the tower.

_____

CR Ex. 5 (Stipulation).  The October 19, 2006 letter from Mariner to the Board of Selectmen seeking approval of the proposed changes states that the tower is located on Hog Hill, off of High Hill Road.  <u>See</u> CR Ex. 1, Tab 2.

See id. at 2.  As part of its application, Mariner submitted a study done by All Point Technology, Inc. ("APT"), which assessed the structural integrity of the tower and the proposed loading and concluded that the existing needle tower could accommodate the proposed modifications.  Finally, Mariner represented to the ZBA that the replacement of antennas on an existing tower would not have any adverse impact on surrounding property values, based on past appraisals and studies prepared in conjunction with similar changes to other existing facilities.

The ZBA held a public hearing on Mariner's application on January 21, 2007.  One member of the ZBA, Sanford Carter, stepped down from consideration of the application because he is an abutter to the site.  At the hearing, the ZBA reached a consensus vote that the proposed changes should be considered as a special exception, under section 700:1[3].  See CR Ex. 7 at 6.  Mariner described the proposed changes to the tower as three antennas that would be flush-mounted to three sides of the tower, 120

---

[3]Under that ordinance, an applicant for a special exception must establish that the proposed change in use:  (i) causes no diminution of the value of surrounding properties; (ii) would benefit the public interest; iii) would result in substantial justice being done, and (iv) it would comply with sections WS300 of the Atkinson Water Supply and Sewage Disposal Regulations. See Section 700:1.e.  Only the first three criteria are implicated here.

degrees apart and protruding approximately one foot from the structure.  Nine additional 7/8-foot coaxial cables would be needed and would either run up through the middle of the tower or be mounted on its supporting legs.  The chairman of the ZBA, Frank Polito, emphasized that minimizing the visual impact of any proposed changes to the tower was a critical aspect of the Stipulation.

Mr. Carter expressed concerns about the structural integrity of the tower, in particular its ability to handle ice loads, guy wires, cable clamps and similar limitations on its stress loads. He and another abutter were concerned about the age of the tower, and that APT's assessment of its structural integrity assumed "new conditions."  Although Mr. Carter relied on APT's November 8, 2006 letter to substantiate his concerns, that letter was written in response to concerns he had expressed previously to the Selectmen and clarified that the tower was sound.  It stated:

> APT visited the site, climbed and visually
> inspected the tower and utilized the most
> recent structural standard that governs
> telecommunication towers, TIA-222-G, to
> analyze the structure's existing condition.
> This analysis found that all tower sections
> and structural members were within allowable
> stresses and at less than 100% capacity.
> Additionally, as stated in our report, the
> existing tower is capable of accommodating

> the equipment proposed by T-Mobile, provided
> that certain existing antennas, cables and
> mounting brackets are removed from the tower
> prior to installing the new antennas.

CR Ex. 1, Tab 7.  Another ZBA member, Hank Riehl, was satisfied
with APT's opinion about the structural integrity of the tower,
but Chairman Polito concluded that further clarification of the
letter and a site walk would be helpful.  See CR Ex. 7 at 6-7.

All of the abutters expressed concern about the fall zone of
the tower and about the negative visual and aural impact of the
equipment box.  The fall zone extended into adjacent property,
but not where any houses were located.  One abutter complained
that she could now see the dish antenna that had been moved from
the tower to the roof of the equipment shelter.  All abutters
were concerned about the possibility of noisy generators being
installed, but Mariner stated that federal regulations did not
currently require back-up generators and, if they were to become
mandatory, Mariner would place them inside the equipment box and
install residential mufflers.  General concern about the loss of
local control over the site was expressed by abutters and members
of the ZBA.  See id. at 7.

The ZBA continued consideration of the application until
after a site walk, at the next regularly scheduled meeting on

10

February 21, 2007.  The ZBA asked Mariner to provide additional information at that meeting about potential federal regulations that could impact the use of the tower, the structural analysis issues Mr. Carter raised, and examples of the antenna and coaxial cables.  <u>See</u> CR Ex. 8.  In response to the ZBA's request, Mariner provided the ZBA with this information by letter dated February 19, 2007.  <u>See</u> Cr. Ex. 11.  In the letter, Mariner stated that it agreed to bundle the coaxial cables into three groups of four cables, which would be attached to each leg of the tower, to maintain the open appearance of the lattice structure.  It also provide the ZBA with an example antenna, however, the sample was only 54 inches rather than the 72 inch size proposed.  Mariner reiterated APT's assessment that the tower could carry the proposed equipment loading and agreed to evaluate the anchoring system if a special exception were granted.  Finally, Mariner provided a memorandum of law to assist the ZBA with its questions about the potential impact of federal and state law on its control over local zoning regulations.  <u>See</u> <u>id.</u>

At the February 21, 2007 ZBA meeting, Mariner's application was discussed further, but not decided.  Chairman Polito advised Mariner that its February 19, 2007 letter had not been received

in sufficient time to be reviewed prior to the hearing, so it would not be considered.  Although Mariner was allowed to read the cover letter into the record, the attached memorandum explaining the law was not considered.  Chairman Polito stated that

> the Board's decision should be blind to the Telecommunication Act, as none of the members are attorneys.  That Board would be making a mistake to grant or deny the application based on their understanding of the Telecommunications Act's position on the siting of a cell tower. That is Federal Law and has nothing to do with the Board.  The Board agreed.

CR Ex. 15 at 3.  The Board believed that as long as the tower was used for commercial businesses and did not expand to a cellular facility that carried public traffic and essential services, like E911, federal law could not trump local regulations.  The Board was concerned about not changing the use of the tower, in order to prevent federal law from preempting the Town's zoning laws. At the time of the application, the tower accommodated only private businesses that employed two-way communications, and the ZBA expressed concern that T-Mobile's use of the site would be significantly different, causing the ZBA to loose control over the tower to state and federal regulatory schemes.  See id.

Mr. Carter again expressed concern about the structural integrity of the tower, and questioned whether the analysis adequately considered its age and its capacity to carry an ice load.  Mariner again cited its engineer study and report, and its certification that the facility meets all of the most recent standards.  Although Mr. Carter asked for an independent evaluation of the tower, the ZBA determined that it would not require an independent analysis of the tower.  <u>See</u> <u>id.</u> at 4.

Mariner responded to the concerns raised by the ZBA and Mr. Carter in a letter to the ZBA dated March 9, 2007.  <u>See</u> CR Ex. 16.  That letter assured the ZBA that the proposed T-Mobile antennas would not cause an expansion of the use of the tower and that the tower structure was capable of accommodating that equipment.  Mr. Carter had asked for a specific answer to his questions, which APT provided by letter dated March 8, 2007.  <u>See</u> <u>id.</u> at 2.  In that letter, APT explained that "hot-dip galvanizing protects steel members in a like-new condition almost indefinitely," and that the "fair" condition assigned to the tower was due to the minor rusting of the cables which, however, still "exceeded their required strength by at least 39 percent." APT explained that ice loading was not accounted for, because, as

a Class I structure, it did not need to be.  APT opined that the Class I designation was appropriate, however, if it were analyzed for ice load under the more stringent Class II criteria, the tower would need to be reinforced in one 10-foot section.  That reinforcement would be necessary if the tower were changed to a Class II structure, regardless of whether or not the T-Mobile equipment were added.  See id. at 2.

On March 21, 2007, the ZBA held a third public hearing on Mariner's application.  See CR Ex. 18.  Mr. Carter submitted a letter in opposition to the tower, expressing his concern about the diminution of property values, the adverse visual impact of the several coaxial cables and larger panel antennas compared with the slender whip antennas, and the potential safety hazard from wind and ice build-up on the panel antennas for those abutters who live within the fall zone.  He also expressed concern about the potential noise problems caused by the batteries and emergency generators on the ground.  Mr. Carter argued that granting the application would decrease the desirability of the surrounding neighborhood, and he submitted a petition signed by 17 neighbors objecting to the tower.  See CR Ex. 19.  Mr. Carter also argued that the tower was not in the

public interest, because T-Mobile "represents a major
intensification of a commercial use in a residential zone," and
because "questions arise from the information provided . . .
concerning the suitability of this structure for the proposed
use." CR Ex. 21 at 1-2. Mr. Carter addressed the substantial
justice criterion, too, arguing that the T-Mobile service could
be provided through other, less obtrusive technologies that could
be located in areas of the town zoned for such uses, rather than
allowing "unbridled expansion of commercial uses on this
inadequately sized site located, as it is, in the middle of a
residential zone." Id. at 2-3. Mr. Carter stated that such spot
zoning was prohibited by the Town's zoning regulations.

    At the hearing, Mariner made a presentation to demonstrate
the visual impact of the proposed changes to the tower. See CR
Ex. 28. It provided examples of a 6-foot cellular panel and the
20 foot whip antenna that will be replaced. Mariner explained
that the sample panel was only about half the width of the panel
specified in the application, and that the panel actually used
would probably be only 56 inches long rather than the 72inch long
example provided. Mariner also presented simulated photographs
of what the current tower looked like without antennas, what it

looks like currently, and what it will look like after the whip
antennas are removed and the flush mount panel antennas are
installed, which will protrude 8-14 inches.  Because the
simulation was not exactly to scale and did not include the
coaxial cables, the ZBA voted by consensus that it was not
accurate.  Id. at 2.

Mr. Carter presented a blow up copy of the simulation, which
he argued depicted the inaccuracies, and cited Mariner's
application, which accurately represents the panel dimensions.
An attorney for Mariner, however, noted that the application plan
view does not provide visual perspective like the simulation
does.  Chairman Polito stated "that one of the most pertinent
pieces of material that the Board was going to consider . . . was
the applicant's claim that the proposal . . . was a reduction in
visual impact," but that the simulation did not establish that
fact and was, therefore, "useless to the Board."  Id. at 3.  In
sum, the parties agreed that the proposed change would reduce the
linear feet of antenna by 10 feet, but would increase the surface
area of antenna by 11 feet.  Id. at 4.

The ZBA then formally reviewed Mariner's application,
considering all the materials submitted before the February 21,

2007 ZBA hearing and the March 9, 2007 letter from Attorney
Connell regarding the governing law.  With respect to the
diminution of property value criterion, Z 700:1 e-1, Mariner
asserted that "based on 17 years building towers through the
northeast," the property values would not be adversely affected
by the proposed change.  Mariner argued that the antennas were in
the public interest, as required by Z 700:1 e-2, because they
were needed to fill a gap in its coverage and, under the TCA,
competition among personal wireless service ("PWS")[4] providers is
in the public interest.

Although Chairman Polito challenged whether the public
interest was served by T-Mobile closing a service gap when other
wireless service was provided in the area, Mariner explained that
only its provision of services was relevant to the analysis and
its signal was different because of the frequency on which its

---

[4]The Town refers to a personal wireless service facility as
a wireless communications facility ("WCF"), but the terms refer
to the same service.  Cf. CR Ex. 26(d) (defining WCF as "any
structure, antenna, tower or other device used to provide a
discrete commercial telecommunication service by a single
provider to a broad base of unrelated users, generally including,
but not limited to:  cellular telephone, personal communications
services, specialized mobile radio, and paging") and Ex. 17
(attaching 47 U.S.C. § 332(c)(7)(C)(i) (defining PWS as
"commercial mobile services, unlicensed wireless services, and
common carrier wireless exchange access service").

Federal Communication Commission ("FCC") license required it to operate.  Mariner stated its propagation analysis and engineering studies submitted with its application demonstrated its need to locate antennas on a tower to fill its coverage gap.  Chairman Polito was not convinced that T–Mobile could not fill its service needs with a tower in the commercial zone of the Town, but Mariner maintained that was not possible.

Finally, Mariner argued that it satisfied the substantial justice criterion, §700:1e–3, because the loss it would suffer if the application were denied would not be offset by the gain to the general public.  Mariner said the antenna would benefit all travelers along Route 121, and that the abutters could not argue that denying the application would eliminate the tower.  The tower is legally there now, even though the abutters may wish it were not, and will remain regardless of whether the proposed changes to it are approved.  Id. at 7.

When the hearing was opened for comment from the public, Mr. Carter spoke on behalf of the abutters.  He again raised the objections voiced previously, pointing to the adverse visual impact of the enlarged surface area of the antennas and the addition of the coaxial cables, that there was no evidence beyond

Mariner's experience with other towers about the changes' effect on property values, and repeated his concern about the tower's structural integrity given predictable ice loads.  Mariner responded that it had obtained several appraisals by MAI Certified Appraiser that consistently showed no diminution of property values, but had not thought those studies were needed because no one had requested them earlier in the application process.  Mariner also said the fall zone was not an issue, if ice were to cause a problem, because the tower would collapse on itself.

At the conclusion of the hearing, the ZBA denied Mariner's application. It voted 4-1 that Mariner had failed to demonstrate the proposed changes would not cause a diminution in property values, based on a finding that the visual impact of the changes and the intensification in the use of the tower would adversely affect property values.  The ZBA voted 3-2 that Mariner had shown that the changes would be in the public interest because they would not change the essential character of the neighborhood and health issues were not a factor.  The ZBA concluded that Mariner had failed to demonstrate that substantial justice would be done by granting the application.  The board voted that Mariner could

continue to use the property as it currently does and so is not losing the property's value, yet granting the special exception would further frustrate the purposes of the RR2 zone. Accordingly, the ZBA voted 4-1 that this criterion had not been met.  The motion to deny Mariner's application was unanimously approved <u>Id.</u> at 11.  On March 30, 1997, formal written notice of the decision was posted.  <u>See</u> CR Ex.27.

Mariner moved for a rehearing pursuant to New Hampshire Revised Statutes Annotated ("RSA") 677: 2&3, on April 18, 2007. <u>See</u> CR Ex. 29.  Attached to its motion was an appraisal report from Deborah B. Haskell, an appraiser with Real Estate Advisors. Ms. Haskell agreed with Mariner's prior representations to the ZBA, asserted both in its application and at the March 21, 2007 hearing, that changing antennas on an existing tower did not have a negative impact on surrounding property values.

Mariner's motion for rehearing was considered at the May 9, 2008 meeting of the ZBA.  At that meeting, the ZBA concluded that its March 21, 2007 decision may have been based on an error of law because a recent NH Supreme court decision refined the definition of, among other things, public interest and substantial justice.  <u>See</u> <u>id.</u> at 2 (citing <u>Malachy Glen Assocs.</u>

20

v. Town of Chichester, 155 N.H. 102, 920 A.2d 1192 (2007)).
Because the Malachy Glen Assocs. decision did not address the
definition of diminution of property values, and because the ZBA
determined the appraisal report was information that reasonably
could have been made available before the March 21 denial, the
ZBA declined to consider the appraisal letter.  The ZBA concluded
that it would reconsider the application based on the other two
criteria, and held another public hearing on the matter on June
13, 2007.

      In a June 12, 2007 letter to the ZBA and again at the June
13, 2007 hearing, Mariner argued that the appraisal should be
considered because it was not submitted as new, additional
information, but was instead proffered to substantiate Mariner's
representation in its application and at the March 21, 2007
hearing that antenna changes to an existing tower do not
adversely affect property values.  See CR Ex. 35 & Ex. 37.  After
some deliberation on the issue, the ZBA maintained it would be
legal error to reconsider the diminution of property value
criterion because the appraisal was information that Mariner
could have presented earlier and because the ZBA had decided that
issue on May 9, 2007.  The ZBA limited its review to the

substantial justice criterion, as requested, and revisited the
public interest factor, despite no appeal on that issue.

Significant attention was given to the issue of whether the
proposed changes —— in antennas and use —— push the tower from a
Class I to a Class II structure.  Mr. Carter relied heavily on
this uncertainty to make the point that the tower was unsafe to
abutters.  Mariner acknowledged the changes could result in a
reclassification of the tower, but offered to make any necessary
repairs or reinforcements if the Special Exception were granted.
The ZBA again concluded Mariner had not carried its burden of
proof and voted to deny the application.  The written denial,
issued on June 28, 2007, summarily found Mariner had failed to
satisfy any three of the criteria for a special exception.  <u>See</u>
CR Ex. 38.  Although the decision indicates that it heard
argument and considered "the entire official record," it
explained its decision simply as "[t]he Board approved a motion
to deny the request based on the criteria of substantial justice
and public interest having not been met and a previous finding
that the diminution criteria was not met."  <u>Id.</u>  Plaintiff, as
Mariner's successor-in-interest of the property, then commenced
this action to seek review of the ZBA's decision.

## 2.   Standard of Review

### (a) Summary Judgment

Under Fed. R. Civ. P. 56(c), a party is entitled to judgment as a matter of law:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.

A "genuine issue" is one which raises a factual dispute which could be resolved in favor of either party, and a "material fact" is one that could affect the ultimate disposition of the matter. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001).   The party moving for summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia, 394 F.3d 40, 42 (1st Cir. 2005).   The evidence submitted in support of the motion must be considered in the light most favorable to the non-moving party, indulging all reasonable inference in its favor.   See Navarro, 261 F.3d at 94. If the moving party demonstrates that no genuine issue of

material fact exists, the burden shifts to the nonmoving party to
"produce evidence on which a reasonable finder of fact, under the
appropriate proof burden, could base a verdict for it; if that
party cannot produce such evidence, the motion must be granted."
Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st
Cir. 1996) (citing Celotex Corp., 477 U.S. at 323; Anderson, 477
U.S. at 249); see also Rojas-Ithier, 394 F.3d at 43 (finding
summary judgment appropriate against a party that fails to
establish an essential element of its case).  On cross motions
for summary judgment, the standard of review is applied to each
motion separately.  See Am. Home Assur. Co. v. AGM Marine
Contractors, Inc., 467 F.3d 810, 812 (1st Cir. 2006) (applying
standard to each motion where cross motions were filed); see also
Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006)
("The presence of cross-motions for summary judgment neither
dilutes nor distorts this standard of review.").

       (b) Substantial Evidence Claim

    Plaintiff moves for summary judgment arguing the ZBA denial
of its application for a special exception is not supported by
substantial evidence in the written record, while defendant
contends it is.  See 47 U.S.C. § 332(c)(7)(B)(iii) (requiring

local decisions on requests to build PWS[5] facilities to be
supported by substantial evidence contained in a written record).
When, as is the case here, the parties move for summary judgment
on the issue of whether or not the local zoning decision is
supported by substantial evidence, the familiar summary judgment
analysis changes slightly.  "The substantial evidence question
would ordinarily be resolved (one way or the other) on the record
before the district court and require no trial."  Town of Amherst
v. Omnipoint Commc'ns, Inc., 173 F.3d 9, 16 (1st Cir. 1999).  The
basis for the decision is limited to the factual record that was
before the zoning board.  See ATC Realty, LLC v. Town of
Kingston, 303 F.3d 91, 99 (1st Cir. 2002).  While the moving
party must still establish an absence of any genuine issue of
material fact, it can meet that burden "by demonstrating 'that
there is an absence of evidence to support the non-moving party's
case.'"  Iowa Wireless Servs. v. City of Moline, 29 F. Supp. 2d
915, 919 (C.D. Ill. 1998) (citing Celotex Corp., 477 U.S. at
323)).

---

[5]"PWS" stands for personal wireless service, which is
defined by the TCA.  See 47 U.S.C. § 332(c)(7)(C)(ii).  This
definition parallels the Town's definition of "WCF," or wireless
communication facilities.  See Z 800:3(c).  The two terms are
used interchangeably to describe the provision of wireless
telecommunication to the public.

Substantial evidence review triggers "'the traditional standard used for judicial review of agency decisions.'" MetroPCS, Inc. v. City & County of San Francisco, 400 F.3d 715, 723 (9th Cir. 2005) (quoting H.R. Conf. Rep. No. 104-458, at 208 (1996)); see Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d 14, 21 (1st Cir. 2002) (same).  The inquiry focuses on whether the record demonstrates that the zoning decision complies with state and local law, i.e., is there substantial evidence that the applicable local law requirements have been met, or not met, to justify the zoning decision? MetroPCS, Inc. at 723-24.  "In other words, we must take applicable state and local regulations as we find them and evaluate the [agency] decision's evidentiary support (or lack thereof) relative to those regulations.  If the decision fails that test it, of course, is invalid even before the application of the TCA's federal standards."  Id. at 724.

If the record does not contain substantial evidence supporting the decision, then the local decision may be pre-empted to effectuate the wireless service goals enunciated in the TCA.  See Second Generation Props., L.P. v. Town of Pelham, 313 F.3d 620, 627 (1st Cir. 2002) (explaining the balance between

local zoning authority and national policy goals struck in the
TCA).  Substantial evidence review is very narrow and highly
deferential to the local board, considering whether the
administrative record contains "such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion."  Id. (citing Sw. Bell Mobile Sys. v. Todd, 244 F.3d
51, 58 (1st Cir. 2001)).  If the evidence can support one of two
conclusions, the court must affirm the ZBA's decision on summary
judgment and not substitute its own judgment for that of the
local board.  See id. (citing Nat'l Tower, LLC., 297 F.3d at 20–
21; see also Sw. Bell Mobile Sys., 244 F.3d at 58 (contradictory
evidence does not undermine substantial evidence finding); Town
of Amherst, 173 F.3d at 16 (deferring to ZBA decision supported
by the administrative record).

        While the review is deferential, it "also has some bite."
Id. at 16 (citing Penobscot Air Servs. v. FAA, 164 F.3d 713, 718
(1st Cir. 1999)).  The court must find that the decision has a
sound factual basis and accounts for even that relevant evidence
that contradicts it.  See AT&T Wireless PCS, Inc. v. City of
Chamblee, 10 F. Supp. 2d 1326, 1329 (N.D. Ga. 1997) (citing
Northport Health Servs. v. NLRB., 961 F.2d 1547, 1550 (11th Cir.

1992).  The agency's findings "'must . . . be set aside when the record . . . clearly precludes the [agency's] decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.'"  Penobscot Air Servs., 164 F.3d at 718 (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 490 (1951)).  The test is an objective test, requiring the local agency simply to fact find and to draw all reasonable inferences from those facts; it is not free to choose which inferences to accept and which to reject.  See Penobscot Air Servs., 164 F.3d at 718.  "Thus, substantial evidence review is not a rubber stamp.. . . Reviewing courts [] are not to abdicate the conventional judicial function."  Id. at 718 n.2 (internal quotation omitted).

### 3.  Plaintiff's Arguments for Reversal

#### (a) Necessity of a Special Exception

Throughout the approval process, plaintiff has maintained that a special exception is not needed, because the proposed changes to the tower do not constitute an "extension, expansion,

28

enlargement, or alteration of a nonconforming use." Z 700:1, a.[6]
This argument does not get out of the starting blocks.  It is
fundamental that statutes are to be given their plain meaning.
See Phillips v. Pembroke Real Estate, Inc., 459 F.3d 128, 139
(1st Cir. 2006) (citing precedent); Weare Land Use Ass'n v. Town
of Weare, 153 N.H. 510, 511–12, 899 A.2d 255, 256–57 (2006)
(citing authority).  In construing a statute, the court will only
consider the actual language used, and not what words might have
been chosen.  See id.  Plaintiff's argument, that the tower has
always been used for communications and so its proposal
represents only a continuation of that use, seems to be premised
on the assumption that a special exception is required only if
the purpose of the nonconforming use is altered, expanded or
enlarged; however, the statute speaks of the nonconforming use
itself, not the purpose of the nonconforming use, as being
expanded, enlarged, extended or altered.  See Z 700:1 ("Any
nonconforming use . . . may be continued *in its present form*"
(emphasis added)).

---

[6]The statute provides, in relevant part:  "Any nonconforming
use . . . may be continued in its present form except . . . no .
. . alteration of a nonconforming use will be allowed without the
granting of a Special Exception by the Board of Adjustment."  Z
700:1, a.

The tower is the nonconforming use of the land here, and it would be altered and expanded if plaintiff's proposal to add PWS equipment were granted.  Plaintiff proposes removing three whip antennas and replacing them with three panel antennas, moving a fourth antenna from the tower to the roof of the equipment box, and running twelve coaxial cables up the tower to service the panel antennas.  Plaintiff's proposal alters the tower by any understanding of the word "alteration."  The ZBA did not err in concluding that a special exception was necessary before plaintiff's project could proceed.

### (b)   Adequacy of the Written Decision

A challenge to the ZBA's denial under the TCA's substantial evidence review begins by assessing the adequacy of the written decision.  See 47 U.S.C. § 332(c)(7)(B)(iii) (requiring any decision by a local governmental agency to be "in writing and supported by substantial evidence").  The challenged denial here consists of both the March 21 and the June 28, 2007 written decisions.  Those decisions must convey the ZBA's analysis of why plaintiff failed to satisfy the criteria for a special exception, and cannot rely on a general reference to the written record or a mere reiteration of the zoning regulation language.  See Sw. Bell

30

Mobile Sys., 244 F.3d at 60 (explaining the scope of the written denial); see also MetroPCS, Inc., 400 F.3d at 722–23 (following Sw. Bell Mobile Sys.); New Par v. City of Saginaw, 301 F.3d 390, 395–96 (6th Cir. 2002) (same).   The written decision does not have to reach formal findings of fact and conclusions of law, but it must clearly state the reasons supporting its conclusions so that meaningful judicial review is possible.   See Sw. Bell Mobile Sys., 244 F.3d at 60 (emphasizing the statutory requirement for a writing decision distinct from the record).   "Even where the record reflects unmistakably the Board's reasons for denying a permit, allowing the written record to serve as the writing would contradict the language of the Act.   The TCA distinguishes between a written denial and a written record, thus indicating that the record cannot be a substitute for a separate denial." Id. (internal citations omitted).

     The June 28, 2007 written decision fails to satisfy the writing requirements of the TCA.   The denial states, in relevant part:

> The Board accepted into the record of this
> hearing the entire official "record" associated
> with the March 21, 2007 decision.   After hearing
> arguments from the abutters and the applicant,
> consideration of the entire official record, and
> after discussion, the Board found that the

> substantial justice and public interest criteria
> were not met.  The Board approved a motion to
> deny the request based on the criteria of substantial
> justice and public interest having not been met and
> a previous finding that the diminution criteria
> were not met.

CR Ex. 38.  This writing does not identify a single basis for the

conclusions reached or otherwise explain any reasons for the

permit denial.  Its incorporation of the "entire official record"

does not guide the court to what evidence was relied on to

determine that denying the special exception "would result in

substantial justice being done" or "be of benefit to the public

interest," as required by the zoning ordinance.  Cf. id.

(accepting a short decision which clearly stated the reasons for

the decision, "to permit an assessment of the evidence in the

record supporting its reasons"); AT&T Wireless Servs. v. Orange

County, 982 F. Supp. 856, (M.D. Fla. 1997) (finding no

substantial evidence where board affirmed prior decision with no

explanation).  Because the June 28, 2007 denial is devoid of any

indication of how the ZBA reached its decision, it does not

comply with the writing requirement of the TCA and is not

supported by substantial evidence.  See Sw. Bell Mobile Sys., 244

F.3d at 60 (reviewing court must be able to evaluate the evidence

cited in support of the decision); see also Sprint Spectrum L.P.

32

v. Town of N. Stonington, 12 F. Supp. 2d 247, 251 (D. Conn. 1998)
(citing authority for requirement that written decision link the
conclusions reached to the record evidence).

By contrast, the March 21, 2007 decision adequately
expresses the reasons for the ZBA's denial and identifies what
portions of the record was relied on to reach the conclusions
made.  The ZBA cited:

> A letter from Mariner . . . as well as the table
> . . . [in] the application provide an inventory
> of the proposed modifications to the subject
> property and tower.  In addition, the applicant
> provided sample antennas, numerous documents,
> and verbal descriptions of the modifications.  In
> addition, there was both written and verbal
> information provided by the abutters regarding the
> proposed modifications.  All of these were considered
> by the Board to form a factual basis of comparison
> between what is allowed in Exhibit A and the
> modifications proposed by the applicant.  In
> addition, the Board considered the facts in the
> official record to determine whether the proposed
> use (providing cellular service from the subject
> property) further intensified the existing commercial
> use of the property in a residential zone.

CR Ex. 27 at 2.  The ZBA found plaintiff had failed to
demonstrate that the proposed changes would not diminish property
values, or that they would result in substantial justice being
done.  See Z 700:1 e-1 and e-3.  The ZBA concluded, however, that
the proposed changes would benefit the public interest.  See Z

33

700:1 e-2.  Plaintiff now contends that neither the diminution of
property value nor the substantial justice criterion is supported
by substantial evidence.  Those criteria for a special exception
are assessed below in turn.

<u>(c)  Diminution of Property Values</u>

The governing zoning regulation provides that a "special
exception *shall be granted* . . . [if] the following conditions
are met for the non-conforming use: . . . there is no diminution
of the value of the surrounding properties."  Z 700:1 e-1
(emphasis added).  In support of this specific requirement, the
ZBA concluded:

> The applicant did not provide site specific
> professional real estate assessment or any
> pertinent professionally written material
> to substantiate that this condition was met.
> Further, there was extensive abutter input
> that led the Board to reasonably conclude
> that the applicant's proposed changes would
> in fact cause a diminution of real estate values.

CR Ex. 27 at 2.  This justification indicates that the Board
wanted real estate appraisal information for the subject
property, which plaintiff did not provide before the March 21,
2007 hearing.  It also indicates that the Board relied on the
representations Mr. Carter made.

34

Although plaintiff did not proffer the type of real estate valuation data the ZBA described in its written denial, there was substantial evidence in the record about the minimal impact the proposed changes would have on property values.  First, the application itself stated:

> The proposed modifications are minor and will not have an adverse effect on the value of surrounding properties.  Numerous appraisals and studies prepared in conjunction with the build out of wireless networks over the past decade have consistently shown that the development of new facilities such as the one on Hog Hill have no negative impact on the values of surrounding properties, even in cases where they are visible from residential areas.  The existing facility has been in place on Hog Hill for over twenty years.  Although the facility may not be popular with the certain abutting landowners, there is no evidence that the facility has had or that the minor modifications proposed will have any adverse effect on property values.

CR Ex. 1 at 3.  At the March 21, 2007 hearing, Chris Ciolfi, plaintiff's Chief Development Officer, stated that based on his 17 years of building towers throughout the northeast, changing antennas on towers does not negatively impact the value of surrounding properties. In response, Chairman Polito noted that Mr. Ciolfi had not brought any documents to substantiate his claims.  <u>See</u> CR Ex. 28 at 4.

35

Following the hearing, plaintiff proffered a real estate
appraiser's report which confirmed that the type of changes
proposed by plaintiff did not alter the existing facility
sufficiently to adversely affect property values.  See CR Ex. 29,
Attachment C.  That appraiser opined:

> In the minutes of the March 21, 2007 ZBA
> meeting, you made a statement supporting the
> assertion made in [your Application for a
> Special Exception] that . . . you are not
> aware of any instances where changing antennas
> on an existing tower had a negative impact on
> surrounding property values.  This is consistent
> with my research of existing telecommunication
> facilities throughout New England where antennas
> have been replaced and/or added for additional
> carriers.. . . Based on my experience as well as
> a review of the information on the 10A High Hill
> Road facility, I agree with your assessment that
> the changes proposed to your existing facility
> will not cause a diminution in surrounding property
> values.

Id.  Although the ZBA declined to consider this evidence, it was
properly submitted by plaintiff as part of the record, both to
substantiate its application and hearing testimony about property
values, and to respond to the ZBA's question and concern.  See
Nat'l Tower, 297 F.3d at 22 (requiring the local board to give
the applicant a "fair chance to respond to the board's reasons,
and perhaps satisfy the board, without first having, literally,
to make a federal case out of the dispute").

In sharp contrast to this evidence, the ZBA relied on "extensive abutter input that led the Board to reasonably conclude that the applicant's proposed changes would in fact cause a diminution of real estate values." CR Ex. 27 at 2. That totally unsupported abutter input included concern about: (i) the visual impact of the proposed panel antennas and coaxial cables; (ii) an increased safety hazard caused by the panel antennas and accompanying batteries; (iii) the public perception of the tower as a cellular facility and the resulting negative impact on potential buyers who do not want to live near a cellular tower; and (iv) the "domino effect" that this expanded commercial use will inevitably lead to additional commercial uses and the further erosion of the residential character of the area. The record demonstrates that plaintiff responded to each of these claims with concrete data, that exposed the lack of substance in these claims and the unreasonableness of the ZBA relying on them.

First, plaintiff provided examples of the panel antennas it intended to install, and photo simulations of the changes to the tower. Although the panels are larger in surface area than the whip antennas they would replace, they would be mounted lower on the tower and closer to the structure. The photo simulations

provide a clear comparison of the mounted panel antennas and whip
antennas, and it was unreasonable for the ZBA to reject that
evidence because of a question about whether the simulated
photographs scaled the perspective perfectly.  The record
reflects that the photographs were intended to depict how the
tower would appear from someone standing on the ground.  The ZBA
also declined to accept the photographs because it found they did
not show how the coaxial cables would alter the appearance of the
tower.  This is similarly unreasonable, as the record clearly
states that plaintiff intended to bundle the cables and mount
them on the inside of the tower, to run up each of the towers'
legs.  It was arbitrary and unreasonable for the ZBA to conclude
that it could not use these photographs for a determination of
the visual impact because they were not accurate.  Both the
sample antennas and the photo simulations were proffered to give
the ZBA a fair representation, not an exact model, of the changes
that were being proposed, which they did.

     Second, the purported safety hazard caused by the panels and
the potential noise caused by their power supply were both
addressed by plaintiff.  An extensive amount of time was given to
the issue of whether the panels would cause ice to build up,

rendering them heavier and more likely to cause the tower to
fall.  These concerns were specifically addressed by plaintiff in
its APT evaluation of the structural integrity of the tower.  The
uncontradicted evidence was that the tower is structurally sound,
its galvanized steel keeps it "in a like-new condition almost
indefinitely," and that the cables "exceeded their required
strength by at least 39 percent."  Plaintiff also directly
responded to Mr. Carter's concern about ice loading by noting
that, as a Class I structure which the tower currently is, there
is no ice loading requirement, and that if the tower were
categorized as a Class II structure, it would need reinforcement
in one 10-foot section.[7]  Although the evidence showed that the
tower's structural integrity is more than adequate, Mr. Ciolfi
also explained that the tower was designed to collapse onto
itself rather than to fall like a tree.  Finally, plaintiff
stated that if any power supply equipment were to generate noise
in the future, residential mufflers would be installed.  Nothing
in the record supports the conclusion that the panels create a

---

[7]If plaintiff succeeds in obtaining approval from the
Selectmen to install the PWS equipment, the issue of what
category structure the tower should be classed as and what, if
any, corresponding reinforcements might be required would be
appropriately addressed at that time.

safety hazard that would adversely impact surrounding property
values.

Third, the abutters argued public perception of cellular
facilities creating health risks deters people from wanting to
live in proximity to them.  The abutters submitted a petition,
signed by 17 people, stating their belief that the tower would
devalue their property.  Mr. Carter stated at the hearing that
some people's unfounded fear of the emissions from cellular
facilities contribute to the diminution in property values.  This
evidence, without more, simply does not tip the scales in the
abutters' favor.  Though they rely heavily on the case of AT&T
Wireless PCS, Inc. v. City Council of Va. Beach, 155 F.3d 423
(4th Cir. 1998), which found that the general concerns of
citizens can amount to substantial evidence, that case is
factually distinguishable from the instant matter.  In City
Council of Va. Beach the community objected to the installation
of a tower in a town which had no commercial antennas or above-
ground power lines and was a heavily-wooded residential area.  A
petition opposing the tower was signed by 90 residents.  Here,
the tower already exists and will continue to operate as a
communications facility, with or without the new panels.  The

40

petition here is signed by only 17 neighbors, which does not evidence the community-wide opposition like occurred in <u>City Council of Va. Beach</u>.  Mr. Carter also frequently stood alone in his positions before the ZBA.  The opposition of some residents is simply not substantial evidence.  <u>See</u> <u>ATC Realty</u>, 303 F.3d at 97 ("[C]ourts have consistently held that a 'few generalized expressions of concern with "aesthetics" cannot serve as substantial evidence on which [a town] could base [a] denial.'" (quoting <u>Cellular Tel. Co. v. Town of Oyster Bay</u>, 166 F.3d 490, 496 (2d Cir. 1999)); <u>Iowa Wireless Servs.</u>, 29 F. Supp. 2d at 921.

Lastly, the abutters contended that granting the special exception would inevitably cause the commercial use of the tower to expand, which conflicts with the residential zoning of the site.  The issue, while legitimate, ignores the regulatory scheme in place which assesses each proposed use of the tower on an individual basis.  What uses might be proposed for the tower in the future are not relevant to the analysis of whether the particular changes at issue here will adversely impact property values.

As the above discussion illustrates, the record does not contain substantial evidence to support the ZBA's conclusion that

the proposed modifications to the existing needle tower will
adversely affect property values.  All of the objective evidence
in the case suggests that Mr. Carter's and the other abutter's
concerns about the adverse impact of the panel antennas on their
property values are based on their personal opposition to the
proposal and not legitimate facts.  It was unreasonable and
arbitrary for the ZBA to reject plaintiff's evidence and opt,
instead, to rely on the "extensive abutter input" to conclude
that property values would be adversely impacted by the proposal.
That input simply is not substantial evidence. See Town of
Amherst, 173 F.3d at 16 (citing cases where denial of permits
were overturned because of "hollow generalities and empty
records"); see also Iowa Wireless Servs., 29 F. Supp. 2d at 921
(citing cases which hold "that the generalized concerns of
citizens are insufficient to rise to the level of substantial
evidence").

                    (d)   Substantial Justice

     The ZBA also concluded that granting the special exception
would not "result in substantial justice being done."  Z 700:1 e-
3.  The ZBA reconsidered this decision based on  Glen Assocs.,
which clarified what "substantial justice" meant.  155 N.H. at

                                42

109, 920 A.2d at 1199.  The court explained "[p]erhaps the only
guiding rule [on this factor] is that any loss to the individual
that is not outweighed by a gain to the general public is an
injustice."  Id. (internal quotation omitted).  Relevant to the
analysis is whether the proposal is consistent with the area's
present use.  Id.  The economic impact of the project, however,
is not a relevant factor in determining the loss to the
individual.  See id. (holding continued economic viability of
project after a denial is not the correct standard to evaluate
the loss to the individual).  The analysis, instead, focuses on
whether the project will still advance the zoning goals if
allowed, so that the "public will realize no appreciable gain
from denying [the application]."  Id.

     The ZBA explained its denial as follows:

          The Board found that the applicant did not
          provide a sufficient factual basis for the
          board to conclude that approval of the
          application would result in substantial
          justice being done.  Further, there was
          extensive abutter input that led the Board
          to conclude that the applicant's proposed
          changes would in fact have an adverse affect
          on the general public by further frustrating
          the intent of Atkinson's RR2 zone.

CR Ex. 27 at 3.  This conclusion also is not supported by
substantial evidence.

43

In support of its application, plaintiff explained to the board that the panel antennas would fill a coverage gap in T-Mobile's wireless service.  To substantiate this claim, plaintiff offered propagation analyses which showed the existing coverage and how it would improve if the antennas were installed.  <u>See</u> CR Ex. 1, Tab 5.  Plaintiff also proffered an analysis of how the proposed changes would enable it to comply with FCC regulations governing electromagnetic emissions limits.  <u>See</u> <u>id.</u>, Tab 6. Plaintiff argued "[s]ince the existing tower is the only Wireless Communications Facility in the vicinity of Hog Hill and the only tall structure where T-Mobile could locate equipment, if a Special Exception is not granted T-Mobile would effectively be prohibited from providing service to the Route 121 corridor and this section of Atkinson."  CR Ex. 1 at 5.

This evidence demonstrates that substantial justice would result if plaintiff's application were granted.  The TCA was enacted "to encourage competition and provide services to the largest feasible number of users," or "increase interservice sharing opportunities."  47 U.S.C. § 332(a).  The proposal at issue would enable T-Mobile to advance those policy goals.  The

proposal to install the panels on an existing communications tower is also consistent with the present use of Hog Hill.

By contrast, the abutters input, on which the ZBA relied, fails to establish how denying the application would benefit them in any appreciable way.  Mr. Carter argues that T-Mobile could consider alternative sites for providing its service and be in compliance with local zoning ordinances and federal law, citing Second Generation.  He further contends that the proposal is "unbridled expansion of commercial uses of this inadequately sized site located, as it is, in the middle of a residential zone." CR Ex. 21.  Although alternative, less intrusive technologies may also fill T-Mobile's coverage gap and are reasonable preferences for Mr. Carter to advocate, the issue for the ZBA to decide here is not whether alternative means are feasible, but whether denying the proposal will effect an "appreciable" public gain.  The record does not demonstrate this.

The evidence in the record shows that replacing the whip antennas with panel antennas cannot reasonably be understood as commercial encroachment into a residential neighborhood.  The tower, which already exists there as a nonconforming use, will not be significantly changed by adding the panels.  Nothing in

45

the record supports the conclusion that, from a public interest
perspective, one type of antenna and the communication signals it
transmits is substantively or markedly different from another
type of antenna.  The new panels continue that use, without
expanding the height of the tower or size of the equipment base.
While the special exception would extend the use of the tower to
provide PWS, that use of the tower is consistent with the
commercial purposes the tower has long been used to advance.

     The evidence in the record also shows that the public would
gain by T-Mobile locating on this existing tower, rather than
building a new structure to fill its coverage gap.  Though the
ZBA emphasized plaintiff's economic interest in the proposal and
its current economically viable use of the site, Malachy Glen
Assocs. instructs that the focus is not on the economic viability
of plaintiff, or T-Mobile, if the special exception is denied,
but on the gain to the public in denying the application.  Here
the objective evidence shows that the public would benefit in
granting the application, because it will result in filling a gap
in PWS that cannot be filled by locating elsewhere in the town.
See CR Ex. 28 at 6-7 (Mr. Ciolfi's statements that no other
location will fill the void, that T-Mobile will pursue building a

new tower if this application is denied, and that T-Mobile has antennas in the commercial zone which do not provide the needed coverage).

The evidence is substantial that denying plaintiff's request for a special exception will result in T-Mobile having a coverage gap, at least until another location can be found to effectively transmit its PWS on its assigned frequency, and that loss is not offset by an advancement in the public interest. For more than 50 years the tower has been used to transmit communications across air frequencies, and the written decision simply fails to indicate what part of the record establishes that the proposal would be inconsistent with the tower's present use.  The ZBA's conclusion that it would not result in substantial justice to grant plaintiff's application is not supported by substantial evidence.

(e)  Public Interest

This factor was decided in favor of plaintiff in March 2007, and the June 28, 2007 decision, which reversed the March 2007 conclusion, is not supported by substantial evidence, as discussed above.  Accordingly, the ZBA finding that this factor weighed in favor of granting plaintiff's application stands.  It

bears noting that the bases for Mr. Carter's objection have been discussed above and dismissed as unfounded.  The concerns about the structural integrity of the tower to carry the load the panel antennas represent were objectively resolved by the APT evaluations.  The record also demonstrates how the public interest is served both by providing continuous PWS coverage and by locating the equipment for that service on an existing tower, to avoid the construction of a similar tower.  The visual impact of any new panel antennas is minimized by the removal of the whip antennas and the dominant presence of the tower itself.  This factor is supported by substantial evidence in the record.

<u>Conclusion</u>

The mandatory language of Z 700:1 e dictates the remedy here.  Because the evidence demonstrates that plaintiff's proposed changes will cause the tower (1) not to diminish the value of surrounding properties; (2) to be of benefit to the public interest; and (3) to result in substantial justice being done, a special exception must be granted.  <u>See</u> Z 700:1 e; <u>see also</u> <u>Cormier v. Town of Danville Zoning Bd. of Adjustment</u>, 142 N.H. 775, 777–78 (1998) (requiring board to grant the exception if the conditions are met).  The record does not contain

substantial evidence to support the ZBA's denial of plaintiff's application for a special exception and, therefore, it does not conform to the requirements of the TCA.  <u>See</u> 47 U.S.C. § 332(c)(7)(B)(iii).  When a zoning board decision violates the TCA, the proper remedy is to instruct the board to grant the request that had been denied.  <u>See</u> <u>Nat'l Tower</u>, 297 F.3d at 22 (discussing why injunctive relief is appropriate).  Accordingly, plaintiff's request for a special exception is granted.  the ZBA is ordered to grant the special exception immediately.

Plaintiff's request to have the ZBA decision declared invalid and overturned is hereby granted.  <u>See</u> <u>Sw. Bell Mobile Sys.</u>, 244 F.3d at 63.  The further relief of issuing all necessary approvals in order for plaintiff to proceed with the installation of the PWS equipment for T-Mobile is denied.  Based on the Stipulation and Addendum that govern the use of the tower at issue here, plaintiff must first seek to obtain approval for the proposed changes to the tower from the Selectmen and must otherwise adhere to the terms and conditions of the Addendum and Stipulation.

For the reasons set forth above, plaintiff's motion for summary judgment as to Count I (document no. 18) is granted, and

49

defendant's motion for summary judgment on Count I (document no. 24) is denied.  This resolution of Count I precludes the need for further analysis of Count II.  Accordingly, the clerk is ordered to close the case.

      **SO ORDERED.**

James R. Muirhead
United States Magistrate Judge


Date:   September 19, 2008

cc:     Steven E. Grill, Esq.
        Leigh S. Willey, Esq.
        Sumner F. Kalman, Esq.
        Thea S. Valvanis, Esq.